[Crim. No. 4969.   First Dist., Div. One.   Dec. 17, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. ERVING
EUGENE NEY, Defendant and Appellant.

Herbert R. Kessler and Mervyn Schneider for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edward P. O'Brien and Paul N. Halvonik, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, P. J.—Defendant was charged in an information with mayhem (Pen. Code, § 203), assault with intent to commit murder (Pen. Code, § 217) and assault with a deadly weapon (Pen. Code, § 245). He pleaded not guilty to each of the three counts. Thereafter the court granted defendant's motion to sever count three from counts one and two and ordered that the cause proceed to trial on the first two counts. (Pen. Code, § 954.) A jury found defendant guilty of mayhem as charged in count one and of assault with a deadly weapon in violation of Penal Code section 245, a lesser and included offense within the crime of assault with intent to commit murder, as charged in count two. Defendant appeals from the judgment of conviction.[1]

No question is raised before us as to the sufficiency of the evidence to support the judgment. Defendant contends that on a number of occasions the prosecuting attorney committed prejudicial misconduct. As we explain, we have concluded that some of the acts complained of have not been properly raised herein and those properly assigned as error do not compel a reversal in the light of the entire record. We therefore affirm the judgment.

In view of the issues, we need not recite the facts in any great detail. We discuss, *infra*, in our separate consideration of the several specifications of alleged misconduct, the facts

---

[1]Defendant also appeals from the order denying his motion for a new trial. Such order is nonappealable and the attempted appeal therefrom must be dismissed. (Pen. Code, § 1237; *People* v. *Justice* (1963) 211 Cal.App.2d 660, 662 [27 Cal.Rptr. 465].)

pertinent to each. It is sufficient at this point to set forth the following background facts.

Defendant and Kay Hinch Ney were married in 1960. During the next three years there was almost continuous marital discord because of Mrs. Ney's drinking and associating with other men. The parties separated on several occasions. Finally defendant sued his wife for divorce and was granted an interlocutory decree in November 1963. Shortly thereafter the parties became reconciled and lived together until March 30, 1964, when defendant moved out of the house.

There was testimony of an altercation the day before between defendant and the victim Jack Ackley over the relationship between the latter and defendant's wife, and of defendant's threats against Ackley in the course thereof. There was also testimony that a week before the commission of the crime defendant told Mrs. Ney's brother that if there was an illicit relationship between Mrs. Ney and Ackley he would ''knock'' the latter senseless and commit the very act of mayhem charged in the first count. The record also reflects evidence that defendant on, a number of occasions had expressed animosity towards Ackley. No useful purpose would be served by setting forth the details of these incidents.

On the morning of June 28, 1964, defendant went to his wife's home in Millbrae and entered her bedroom where Ackley and Mrs. Ney were in bed together asleep. Billy Hinch, Mrs. Ney's 10-year-old child by a former marriage, saw defendant leaning over Ackley and hitting the latter about the head and neck with a black object that looked like a hammer. Having spotted Billy in the doorway, defendant brought him back to his room and closed the door. Defendant then returned to his wife's bedroom and, according to Billy, after spending about five minutes there, finally left the house. Billy then returned to his mother's bedroom, saw Ackley in bed covered with blood and awoke his mother. The police were called.

Subsequent examination of Ackley disclosed that his entire penis had been removed in what appeared to be a deliberate manner. As a result of the blows to his head, Ackley lost the sight of his right eye and sustained serious damage to the sight of his left eye.

Defendant testified that at the time he was greatly wrought-up by his wife's conduct, that he recalled being in her bedroom and seeing the victim in a bloody condition but that he had no recollection of committing the acts charged.

The defense introduced expert opinion evidence by a psychiatrist to the effect that defendant's consciousness was so clouded that he was not aware of what he was doing and "would be unable to deliberate and formulate and carry out any rational judgment." As defendant's brief puts it, the defense was based on his state of mind and his mental collapse precipitated by his wife's conduct.

In our consideration of the errors asserted on appeal we must be guided by the following well-settled principles. ▮ Misconduct of the prosecuting attorney may not be assigned as error on appeal if it has not been assigned at the trial unless, the case being closely balanced and presenting grave doubt of the defendant's guilt, the misconduct contributed materially to the verdict or unless the harmful results of the misconduct could not have been obviated by a timely admonition to the jury. (*People* v. *Berryman* (1936) 6 Cal.2d 331, 337 [57 P.2d 136]; *People* v. *Kirkes* (1952) 39 Cal.2d 719, 726-727 [249 P.2d 1]; *People* v. *Lyons* (1958) 50 Cal.2d 245, 262 [324 P.2d 556]; *People* v. *Wein* (1958) 50 Cal.2d 383, 396 [326 P.2d 457]; *People* v. *Perez* (1962) 58 Cal.2d 229, 247 [23 Cal.Rptr. 569, 373 P.2d 617]; *People* v. *Rosoto* (1962) 58 Cal.2d 304, 357 [23 Cal.Rptr. 779, 373 P.2d 867], cert. denied 372 U.S. 955 [83 S.Ct. 953, 9 L.Ed.2d 978]; *People* v. *Golston* (1962) 58 Cal.2d 535, 541 [25 Cal. Rptr. 83, 375 P.2d 51], cert. denied 372 U.S. 955 [83 S.Ct. 954, 9 L.Ed.2d 979]; *People* v. *Basler* (1963) 217 Cal.App.2d 389, 399 [31 Cal.Rptr. 884]; *People* v. *Clay* (1964) 227 Cal. App.2d 87, 101-102 [38 Cal.Rptr. 431, 100 A.L.R.2d 1421].) Subject to the foregoing two exceptions, it is the general rule that error predicated on the alleged misconduct of the prosecutor cannot be raised on appeal in the absence of (a) an assignment of such misconduct as error and (b) a request to the trial court to instruct the jury to disregard it. (*People* v. *Codina* (1947) 30 Cal.2d 356, 362 [181 P.2d 881]; *People* v. *Sampsell* (1950) 34 Cal.2d 757, 763-764 [214 P.2d 813], cert. denied 339 U.S. 990 [70 S.Ct. 1016, 94 L.Ed. 1391]; *People* v. *Kirkes, supra*; *People* v. *Wein, supra*; *People* v. *Fisher* (1948) 86 Cal.App.2d 24, 33 [194 P.2d 116]; *People* v. *Tolson* (1952) 109 Cal.App.2d 579, 582 [241 P.2d 32]; *People* v. *Wells* (1960) 187 Cal.App.2d 324, 333 [9 Cal.Rptr. 384]; *People* v. *Clay, supra*.) ▮ A mere objection to the allegedly prejudicial statements without a request to the court to instruct the jury to disregard them is ordinarily insufficient to raise the question of misconduct on appeal.

(*People* v. *Knott* (1940) 15 Cal.2d 628, 633 [104 P.2d 33, 128 A.L.R. 1367]; *People* v. *DuBois* (1936) 16 Cal.App.2d 81, 87 [60 P.2d 190]; *People* v. *Dunlop* (1947) 79 Cal.App.2d 207, 212 [179 P.2d 658]; *People* v. *Wells, supra,* 187 Cal.App.2d 324, 333.) ''Whether a prosecutor has been guilty of prejudicial misconduct must be determined in the light of the particular factual situation involved.'' (*People* v. *Lyons, supra,* 50 Cal.2d at p. 262; *People* v. *Basler, supra,* 217 Cal. App.2d at p. 399.)

The only issues presented on this appeal are the following four specifications of misconduct.

■ *First*: Defendant's first specification actually embraces four instances of alleged misconduct involving a tape-recorded statement given by defendant to Chief Lawrence Pickett of the Millbrae Police Department. We glean from the record that Mr. Woodman, defendant's attorney at the trial, upon ascertaining that a warrant had been issued for defendant's arrest, made arrangements with the chief to have defendant surrender himself at the Millbrae Police Department on June 29, 1964, the day after the commission of the crime. According to Mr. Woodman, he told Chief Pickett that he would give defendant instructions not to make any statements. Whatever may have been the subsequent misunderstanding among all parties concerned, it appears that the chief took a tape-recorded statement from defendant in which the latter, among other things, admitted that he had hit Ackley twice with a two-by-four wrapped in felt at the end, that he had cut off Ackley's penis with a pocket knife, and that he had thrown the two-by-four off the San Mateo Bridge and put the penis down a sewer. Chief Pickett testified at the preliminary hearing without objection to defendant's above statements in response to questions directed to him by Deputy District Attorney Doherty, who was the prosecutor at the trial. At that time, defendant's counsel Mr. Woodman was present, cross-examined the chief, developed that defendant's statements had been tape-recorded and transcribed, requested and then read a copy of the statement and secured an order that both the tape and transcription be made available to him. The prosecutor later furnished defendant's counsel with a copy of the statement.

Defendant complains that the prosecutor used the opening statement to get defendant's ''inadmissible'' statement before the jury, reminded the jury of the statement by calling the chief as a witness and compounded the misconduct by

using the facts contained in the statement during the cross-examination of defendant and his expert witness.

In concluding his opening statement to the jury the prosecutor said: "Mr. Pickett, Chief Pickett, will testify, after a conversation with Mr. Woodman, the defendant's attorney, Mr. Ney, the defendant, came to his office and told him that yes, he had struck him a couple of times with a two-by-four, and he used a pocket knife to remove his penis; that he had thrown the pocket knife and the two-by-four off the San Mateo Bridge, and flushed the penis down the toilet or into the sewer, and with this, ladies and gentlemen, we will present our case." The defense thereupon deferred its opening statement and the prosecution called its first witness.

At the beginning of the second day of the trial the prosecutor called Chief Pickett stating "Before Chief Pickett testifies, I would like to discuss the legal implications outside of the hearing of the jury." The chief was not in the courtroom; the jury was excused; and the court and counsel thereupon discussed out of the jury's presence the circumstances surrounding the taking of defendant's statement and their effect on its admissibility, particularly in view of the decision of the Supreme Court of the United States in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. At the end of the colloquy, the prosecutor apparently decided that he would not attempt to introduce defendant's statement and that he would probably call Chief Pickett in rebuttal to testify as to his *observations* of defendant at the time.[2] After brief testimony from a medical witness, the prosecution thereupon rested.

---

[2]At the beginning of the proceedings outside the jury's presence, the prosecutor announced that a problem had arisen in connection with Chief Pickett's testimony because of the decision in the *Escobedo* case and the first decision in *People* v. *Dorado* rendered before rehearing was granted. (See *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], decided January 29, 1965 upon rehearing.) The record reflects that the prosecutor apparently felt he should not "take a chance." Pertinent excerpts follow:

"Mr. DOHERTY [Deputy District Attorney]: It is our position—
THE COURT: (Interposing) I don't see why you want to take a chance.
MR. DOHERTY: I agree. I want to make my position clear; not Durado [*sic*], but Escobeda [*sic*]—knowing he had an attorney to represent him.
THE COURT: It holds that knowing— MR. DOHERTY: (Interposing) If the police know that the fellow is represented by an attorney, they are really forbidden to question without the permission of the attorney and also without the attorney being present."

"[THE COURT] We will agree that we will not let the conversation in, and— MR. DOHERTY: No. We feel that the Chief has a right to testify as to his observations of the defendant at the time. In other words, his

Defendant now contends that the prosecutor (1) produced no evidence of defendant's alleged confession alluded to in the opening statement and (2) called Chief Pickett to the stand only as a reminder to the jury of the confession. Both acts, it is urged, constitute prejudicial misconduct.

As to the opening statement, in *People* v. *Nelson* (1964) 224 Cal.App.2d 238, 252-253 [36 Cal.Rptr. 385], we said: "The rule is that in an opening statement it is the duty of counsel to state the facts fairly and to refrain from referring to facts which he cannot or will not be permitted to prove. [Citations.] In a criminal case, the sole purpose of an opening statement by the People is to outline what the prosecution intends to prove, . . . Subsequent failure of the prosecutor to secure the introduction into evidence of what he claimed he would prove does not necessarily indicate prejudice particularly in the absence of a showing of bad faith. [Citations.]"

The record in the instant case fails to disclose that the prosecutor made the pertinent remarks in bad faith or without any intention of supporting them with evidence. The prosecution had defendant's tape-recorded statement substantiating the above remarks. At the preliminary hearing, Chief Pickett had testified to the contents of the statement without any objection from defendant's same attorney who had seen, read and later received a copy of the statement. From what we can deduce from the record, the statement was not so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted. This conclusion on our part is corroborated by the fact that defendant's counsel who had possession of a copy of the statement made no objection or remonstrance of any kind to the prosecutor's reference to defendant's admissions. Defendant argues that the prosecutor must have known that the statement was inadmissible because it contained a remark by the chief to defendant that "Anything you do voluntarily will be to your advantage."

---

mental condition, his orientation, his ability to understand and answer questions.''

"THE COURT: (Interposing) Aren't you anticipating the defense? Shouldn't you wait until you see what they throw at you, and Mr. Pickett could be used as a rebuttal witness. I think you are anticipating the defense, and the man is presumed to be normal and the burden is upon the defendant to show that something else—I think Mr. Doherty, if I were you, I would keep Pickett up in the coffee room so he will make a good rebuttal witness. Off the record. (Discussion off the record.)"

The prosecutor then announced that, after calling a medical witness, he would rest.

But we do not have defendant's entire statement before us and the above excerpt appears in the present record only as one of the several fragments to which both counsel referred in their discussions with the court out of the jury's presence on the second day of the trial. We cannot say on the basis of this fragment and on the present record that the chief made a promise of leniency or advantage to defendant which was the motivating cause of defendant's statement, thereby making it involuntary and inadmissible as a matter of law. (*People* v. *Brommel* (1961) 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845]; *People* v. *Nelson, supra,* 224 Cal.App.2d 238, 248 and cases there cited.) Indeed defendant's argument cuts both ways, for if the inadmissibility of defendant's statement was as self-evident as defendant now claims, it was equally so to defendant's counsel who uttered no word of objection.

While the record is not clear, it gives some indication that both counsel discussed defendant's statement on the evening of the first day of trial and the prosecutor then interviewed the chief the next morning concerning what the prosecutor understood to be instructions from defense counsel to the chief that he would not want a statement taken.[3] A fair reading of this part of the record leaves us with the impression that the prosecutor first learned of this only the night before and *after* making his opening statement. This seems to have in turn provoked a question as to the applicability of the *Escobedo* and *Dorado* decisions, a subject causing some perplexity at the time,[4] although the record does not disclose whether this came about because of the preceding evening's discussion. Finally, as we have said, the prosecutor, after observations by the court, declined "to take a chance" by introducing the confession. In the light of all these circum-

---

[3]Apparently defense counsel did not go as far as the prosecutor thought. During the proceedings outside the jury's presence, Mr. Woodman stated: "I did not tell Chief Pickett he is not to be interrogated unless I was present. I told the Chief I would give Mr. Ney instructions he was not to make any statement until such time he had any dealing in the matter with the attorney."

[4]The trial began on October 27, 1964. *Escobedo* had been decided only four months before on June 22, 1964. Although the first *Dorado* decision had been rendered on August 31, 1964 (see *People* v. *Dorado* (Cal. 1964) 40 Cal.Rptr. 264, 394 P.2d 952), a rehearing had been granted just a month previously on September 24, 1964, and the second decision was not rendered until January 29, 1965, after the trial was concluded. The *Dorado* decision was not in legal existence at the time of the trial. It is also notable that at the time of the preliminary hearing on July 7, 1964, only *Escobedo* had been decided.

stances, there is simply no basis in the record for defendant's claim that the prosecutor deliberately and in bad faith called the chief as a witness[5] in order to remind the jury of defendant's confession. We find no misconduct in respect to either of the above incidents. In any event, defendant's counsel, who was fully aware of his statement to the chief and had been furnished with a copy of it, interposed no objection to either incident, did not assign them as acts of misconduct and made no request of the trial court to instruct the jury to disregard them.

We turn to the third and fourth instances covered by the first specification of misconduct. In respect to these, the prosecutor is charged with using the facts of defendant's statement during cross-examination and thus bringing before the jury evidence never produced and only alluded to in the opening statement to the jury.

The record reflects the following:

▮▮▮ (3) During the cross-examination of defendant the prosecutor asked, "Didn't you throw the penis down the sewer?" to which defendant replied, "I don't know." Shortly thereafter, during a series of questions noted below,[6] the prosecutor asked if it were not a fact that defendant struck the victim with a two-by-four and later threw it off the San Mateo Bridge to which defendant replied "I don't know." Defendant's objection noted below was not ruled upon but the court thereupon asked the witness if he had gone across the San Mateo Bridge to which the latter replied "I don't know." A short time later, the prosecutor asked defendant if he owned a pocket knife, to which defendant replied in the affirmative.[7] When the prosecutor pressed the witness as to whether

---

[5]As already stated, Chief Pickett was not in the courtroom and did not take the stand when called.

[6]The following took place: "Q. [By the prosecutor] What do you think you struck him with? A. I don't know. Q. Isn't it a fact you struck him with a two-by-four? A. I don't know that. Q. Isn't it a fact that you drove across San Mateo Bridge, you threw it off the bridge into the water? Mr. WOODMAN [Counsel for defendant]: Objection. Objection. Fact not in evidence."

[7]The following took place: "Q. [By the prosecutor] Now, when you came to, standing over Ackley, you had nothing in your hand; how about a cutting instrument? Did you have a cutting instrument in your hand? A. I don't remember of having anything in my hand, Mr. Doherty. Q. Do you own or did you at that time own a cutting instrument? A. I own numerous cutting instruments; very many of them. Q. And isn't it true you owned a razor sharp pocket knife? A. No. . . . Q. And as carpenter, you didn't own a pocket knife? A. I owned a pocket knife to sharpen pencils with."

he ever owned ''a little bob chain pocket knife'' defense counsel's objection was sustained, the court observing that the prosecutor was assuming something not in evidence. With the two exceptions noted above, defendant made no objection to any of the foregoing questions.

(4) During the cross-examination of Dr. Rapaport, defendant's expert who testified that defendant at the time of the offense was not aware of what he was doing, the prosecutor asked the following questions now claimed to be objectionable: '' [I]sn't it best to have all the information on the case available to you before or after interviewing the defendant? . . . Did you review the police reports? . . . Did you interview the Chief of Police in Millbrae in connection with the background of the case?'' Defendant made no objection to any of the foregoing. Additionally it is argued that the prosecutor disparaged the doctor's testimony during his closing argument to the jury.[8]

The applicable rule is stated in *People* v. *Lo Cigno* (1961) 193 Cal.App.2d 360, 388 [14 Cal.Rptr. 354], where the court said: ''It was improper to ask questions which clearly suggested the existence of facts which would have been harmful to defendant, in the absence of a good faith belief by the prosecutor that the questions would be answered in the affirmative, or with a belief on his part that the facts could be proved, and a purpose to prove them, if their existence should be denied.'' (In accord: *People* v. *Perez, supra,* 58 Cal.2d 229, 241; *People* v. *Hamilton* (1963) 60 Cal.2d 105, 116 [32 Cal.

---

[8]The pertinent parts of the prosecutor's argument are as follows: ''He [Dr. Rapaport] admitted, 'I don't even know whether he had done this. I don't know what time it had occurred. I only know what Ney told me,' and then I asked him: 'Did you read the police report, Doctor?' 'No.' 'Did you talk to the Chief of Police of Millbrae in whose jurisdiction this event occurred for possible filling in some blank spaces?' MR. WOODMAN [Counsel for defendant]: Objection. There is no information that admits anything to be filed in this regard. This is a hint there may be other extraneous evidence. This is improper argument and I object. THE COURT: Proceed. MR. DOHERTY [Prosecutor]: Did you notice the doctor when I was pursuing this thought? Did you notice he became apprehensive to tell me: 'Is there something I should know? I am only basing my opinion on the—we have the rules of evidence. You know what you can get, and we can only get what they want to give you,' but he could have gone to the Millbrae police body— MR. WOODMAN: Objection. MR. DOHERTY: —to learn the hour, at least, when it occurred. Who knows what else? Wouldn't a person who was going to base an opinion of such vital importance where he would take one hour out of the life of the defendant and say during that hour it is my opinion that he was unconscious and he could not be held responsible for the criminal acts that this defendant performed. Are you going to base your decision on opinion given by a doctor who is that careless about ferreting out the facts?''

Rptr. 4, 383 P.2d 412]; *People* v. *Miller* (1963) 211 Cal. App.2d 569, 576 [27 Cal.Rptr. 290]; *People* v. *Lugo* (1963) 220 Cal.App.2d 54, 61 [33 Cal.Rptr. 572]; *People* v. *Swayze* (1963) 220 Cal.App.2d 476, 497 [34 Cal.Rptr. 5]; *People* v. *Vasquez* (1964) 224 Cal.App.2d 206, 211 [36 Cal.Rptr. 337]; see 6 Wigmore on Evidence (3d ed. 1940) § 1808, pp. 276-279.)

It appears to us that by asking defendant if he had not thrown the victim's penis down a sewer and had not hit the victim with a two-by-four later thrown off the San Mateo Bridge, the prosecutor was merely bringing to the attention of the jury the facts contained in defendant's confession to Chief Pickett and alluded to in the prosecutor's opening statement. The district attorney could not reasonably entertain a good faith belief that his questions would be answered in the affirmative since defendant maintained that he was unaware of what he was doing on the day of the crime and had already responded "I don't know" to previous questions. Moreover, the district attorney knew he could not prove the facts referred to and had already decided not to prove the confession. We think the above questions were improper. However, when questioned about possession of a pocket knife the defendant answered affirmatively (see fn. 7, *ante*). In addition, the prosecution had introduced evidence of statements made by defendant to Mrs. Ney's brother to the effect that if there was an improper relationship between Mrs. Ney and Ackley, defendant would "cut off his organ." Since Ackley actually suffered such an injury and defendant admitted being in the bedroom, it was proper to inquire as to defendant's possession of a pocket knife in an effort to connect defendant circumstantially with the crime. We find no misconduct in respect to the last series of questions directed to defendant.

Nor do we find any misconduct arising out of the questions directed to Dr. Rapaport and claimed to be objectionable. This witness on direct examination had expressed an opinion based on various factors as to defendant's ability to deliberate and formulate a rational judgment. The weight to be accorded such opinion depended upon the reasons assigned to support it and once having given the opinion, the doctor could be subjected to the most rigid cross-examination as to both the opinion and the bases on which it was predicated. (Code Civ. Proc., § 1872; *People* v. *Jones* (1964) 225 Cal.App.2d 598, 611 [37 Cal.Rptr. 454].) While it is arguable that the prosecutor's closing comments on this medical evi-

dence hints at defendant's confession given to Chief Pickett, after a careful examination of the remarks (see fn. 8, *ante*), we cannot say that the closing argument was improper. We find no misconduct.

■ Although, as we have explained, the questions asked of defendant as to the disposition of the victim's penis and of the assault weapon were improper, defendant made no objection to the first set of questions and but a bare objection to the second, without any assignment of misconduct or request that the jury be admonished. Under the circumstances defendant cannot now raise the point on appeal since any harmful effect of either series of questions could have been obviated by an admonition of the court to the jury. (See *People* v. *Berryman, supra,* 6 Cal.2d 331, 337, and other cases cited therewith.) This is not a case where the evidence was so closely balanced, presenting grave doubt as to defendant's guilt that the asking of the above questions contributed materially to the verdict. (*People* v. *Berryman, supra; People* v. *Nelson, supra,* 224 Cal.App.2d 238, 255.)

■ *Second:* Defendant contends that the prosecutor committed prejudicial misconduct by calling defendant's wife as a witness, knowing that defendant would not give his consent[9] and thus compelling defendant to prejudice himself before the jury by objecting to her testifying.

Although Penal Code section 1322 speaks in terms of the *competency* of a spouse to be a witness, it is now settled that the statute refers to a privilege which may be waived by failure to object. (*People* v. *Singh* (1920) 182 Cal. 457, 483 [188 P. 987]; *People* v. *Wilkins* (1955) 135 Cal.App.2d 371, 379 [287 P.2d 555]; *People* v. *Moten* (1962) 207 Cal.App.2d 692, 695 [24 Cal.Rptr. 716].) ■ As a general rule "if the prosecution desires to use the husband or wife of the defendant as a witness the proper procedure is to offer the spouse as a witness, subject to the claim of privilege by the defendant. [Citation.]" (*People* v. *Klor* (1948) 32 Cal.2d 658, 663 [197 P.2d 705], cert. denied 336 U.S. 920 [69 S.Ct. 642, 93 L.Ed. 1082]; *People* v. *Bigelow* (1958) 165 Cal.App.2d 407, 416 [332 P.2d 162]; *People* v. *Wilkins, supra,* 135 Cal.App.2d 371, 379; *People* v. *Chand* (1953) 116 Cal.App.2d 242, 251 [253 P.2d 499]; *People* v. *Carmelo* (1949) 94 Cal.App.2d 301, 305-306 [210 P.2d 538]; *People* v. *Harmon* (1948) 89 Cal.

---

[9]Penal Code section 1322 provides in relevant part: "Neither husband nor wife is a competent witness for or against the other in a criminal action or proceeding to which one or both are parties, except with the consent of both, . . ."

App.2d 55, 62 [200 P.2d 32].)[10] There is nothing in the above statute requiring the prosecution, prior to calling such witness, to inquire in secret or outside of the jury's presence as to whether the defendant will object to his or her spouse's testifying. (*People* v. *Klor, supra*; *People* v. *Moore* (1931) 111 Cal.App. 632, 634 [295 P. 1039].)

In the instant case, defendant's wife was called by the prosecution and was sworn. Before any direct examination, defendant's counsel examined the witness on *voir dire,* establishing that she was still married to defendant. He then requested a discussion in chambers "about the procedure used by the District Attorney knowing that this woman is wholly competent [*sic*—incompetent (?)] to testify." Instead, the court interposed "She can't testify" and excused the witness. Other than what may be implied in the above quoted statement, defendant made no objection to the occurrence, did not assign it as misconduct, and made no request that the jury be instructed to disregard the incident.

Defendant relies upon *People* v. *Solis* (1961) 193 Cal.App. 2d 68 [13 Cal.Rptr. 813] and *People* v. *Gill* (1956) 143 Cal. App.2d 46 [299 P.2d 682]. In *Solis,* before the jury was impanelled, defendant's counsel stated in chambers in the presence of the district attorney: " 'I would like the record to show at the very beginning that the defendant will object

[10]Cf. *People* v. *Ward* (1958) 50 Cal.2d 702, 712-713 [328 P.2d 777, 76 A.L.R.2d 911] (cert. denied 359 U.S. 945, 79 S.Ct. 730 [3 L.Ed.2d 678]) where the district attorney was charged with misconduct "in offering the defendant's wife as a witness for the prosecution. An objection to her competency as a witness was sustained and she did not testify." The court stated: "Similar action on the part of the district attorney was held to be 'improper and unwarranted' but not prejudicial in *People* v. *Klor,* 32 Cal.2d 658, 663 [197 P.2d 705] . . . The conduct of the district attorney in this respect in the present case is subject to the same criticism and should not have taken place, but in consideration of the entire record it was not so seriously reprehensible as to require a reversal." However, in *Klor, supra,* the district attorney in closing argument commented on the failure of defendant's wife to testify and the court held: "In these circumstances, the calling out of her name during the course of the prosecution's case, with no evident intention of making her a prosecution witness, *coupled with the later references in the argument to the jury as to her failure to testify,* was improper and unwarranted." (Italics added.) (32 Cal.2d at p. 663.) The opinion in *Ward* does not indicate whether the same combination of facts existed so as to warrant the "same criticism." We doubt whether *Ward* holds that the mere calling of a defendant's spouse by the prosecution is improper and we find no language therein disapproving of the statement in *Klor* as to the proper procedure for calling a defendant's spouse. At any rate *Ward* does not appear to have been cited in support of such a proposition. In fact, it is only once referred to in a subsequent case dealing with a slightly different question. (See *People* v. *McManus* (1960) 180 Cal.App.2d 19, 33-34 [4 Cal.Rptr. 642].)

to the calling of the wife as a witness, . . .' " (P. 70.) The prosecutor nevertheless called the wife, forcing defendant to object in the presence of the jury. The court observed that the prosecutor *knew in advance* such procedure would serve no purpose except unfairly to prejudice defendant—and concluded that "in the light of the entire record" the misconduct constituted prejudicial error. In *Gill,* which is cited in *Solis,* during the prosecution's case, while an officer was testifying, defense counsel objected to a question relating to a conversation between the officer and the defendant's wife in the presence of the defendant. The prosecution called the wife in rebuttal whereupon defendant objected to her testifying. It was held that the prosecutor was guilty of prejudicial misconduct, the court stating: "The mere fact that the prosecution calls the wife of a defendant as a witness is not improper. In the present case, however, the deputy district attorney knew that during the first part of the trial, defendant had objected to the deputy's question as to whether Officer Banks had spoken to defendant's wife. . . . It is obvious that the deputy knew, when he called defendant's wife as a witness, that she would not be permitted to testify; and it is obvious that he intended thereby to unfairly create an unfavorable impression against defendant. When this conduct of the deputy is considered in connection with his conduct in asking defendant the irrelevant questions about Miss Hillary, it seems apparent that the deputy intended that a substantial part of the trial should be by unfair innuendoes." (143 Cal. App.2d at p. 52.) In essence the above two cases hold that the mere calling of the spouse is not improper but that such act conjoined with other conduct or considered with other events in the record may constitute prejudicial misconduct.

We are of the view that under all of the circumstances of the instant case, the calling of defendant's wife was not improper. As distinguished from the situations in *Solis* and *Gill, supra,* defendant had not previously indicated during the trial that he would object to such procedure. Indeed the record discloses no objection made during the prosecutor's opening statement when the latter stated to the jury that Mrs. Ney would be called.[11] We are not inclined to presume knowledge on the part of the prosecution that an objection would be made at the trial merely because an objection had been made at the preliminary hearing, although we do not

[11]The prosecutor stated: "There will also be Mrs. Kay Hinch Ney called to the stand. What she will testify to, I can't say."

wish to be understood as holding that the latter can never be a significant circumstance. We only hold that under the present circumstances there was no misconduct. Even assuming for the sake of argument some impropriety in the procedure, defendant did not assign the same as misconduct and, as pointed out *supra,* this is not a case where, in the absence of such assignment, misconduct can nevertheless be urged on appeal. (*People* v. *Berryman, supra,* 6 Cal.2d 331, 337.)

    *Third:* Defendant complains that the prosecutor committed prejudicial misconduct when, in his closing argument, he commented on the fact that defendant prevented his wife from testifying.[12] Defense counsel assigned the remarks as prejudicial misconduct and requested ''a conference in chambers'' but did not request an admonition to the jury. Nevertheless the trial judge directed the jury to disregard the remarks. While the statement was improper, the jury were promptly and adequately admonished. We must assume that they heeded the admonition (*People* v. *Black* (1941) 45 Cal. App.2d 87, 98 [113 P.2d 746]) and we conclude that any harmful effect of the remarks on the jury was thereby obviated.

*Fourth:* Finally we discuss *seriatim* a number of charges of misconduct allegedly occurring during the closing argument of the prosecutor.

    1. Defendant complains that in three separate instances the prosecutor referred to Mrs. Ney as defendant's ''sex mate'' or ''bedmate'' thus arousing the prejudice of the jury. Despite evidence of her associating with other men, the epithets were improper. However, no objection was made. Clearly a proper assignment of misconduct could have obviated any harmful effects.

    2. It is charged that on one occasion the prosecutor in an attempt to arouse the passion of the jury referred to defendant as a person with an abandoned and malignant heart.[13] The statement was reasonably descriptive of the criminal acts involved and therefore within the scope of legitimate argument. (See Witkin, Cal. Criminal Procedure (1963) § 460, p. 464.) Furthermore, no objection was made.

---

[12]The objectional remarks were: ''Not only did he, on the stand, try to make Kay Ney—pardon the expression, 'a bum,' he prevented her from taking the stand and answering any of these charges.''

[13]The statement in relevant part was: ''I submit that no one, no one except a person with an abandoned and malignant heart would do to anybody what Ney did to Jack Ackley, . . .''

■ 3. Defendant complains that the prosecutor commented on the honesty of the prosecution's witness Billy Hinch, the comment being allegedly based on his personal belief, and then appealed to the sympathy and aroused the passion of the jury by arguing that this young witness would suffer the same kind of scars mentally: "Think of living with this the rest of one's life and seeing him come down with the weapon, smashing the head of Jack Ackley in front of his eyes." The first part of the statement was not, as defendant claims, an assertion made on the prosecutor's personal belief but proper comments on the credibility of the witness as disclosed by the evidence and a legitimate argument as to the conclusions which the jury could properly draw. (*People* v. *Rosoto, supra,* 58 Cal.2d 304, 360-361; *People* v. *White* (1963) 212 Cal.App.2d 464, 465-466 [28 Cal.Rptr. 67].) The second part of the statement was an improper appeal to the jury. However, no proper assignment of misconduct was made.[14]

■ 4. It is also claimed that sometime later, during the prosecutor's argument in rebuttal, he attempted to arouse the passion of the jury by commenting on the effect of the criminal act upon the victim.[15] The remarks in question appear to have been made in response to an argument of defense counsel pointing out the provocation furnished by defendant's discovering a 26-year-old man in bed with defendant's wife. Defense counsel objected upon the ground that it was "opinion and conjecture." The argument was inflammatory and improper. However, if a proper assignment of error had been made, any harmful effects would have been eliminated.

■ 5. Lastly, defendant charges misconduct in the prosecutor's comments on the "type of defense" relied on in the instant case.[16] Defense counsel objected that "These are not

---

[14]The following transpired: "MR. WOODMAN [Counsel for defendant]: There was no such testimony by this— THE COURT (Interposing) The jury heard all of the evidence. The jury heard, . . ."

[15]Pertinent portions of the remarks follow: "What in God's name does he mean by that? Is he trying to justify Ney's actions in this case? Does he realize what Ney has done; what a vile thing that has been brought to Ackley who is only 26 years of age? What is his life expectancy, 20 years; 25 years? . . . Well, what are his prospects for the future? Can he ever be married and have children? . . . He is blind in one eye and his other eye is seriously damaged, and isn't it likely he is going to lose the other eye? Who's going to take care of him. The Lighthouse for the Blind; his parents; his sister? Can you remain impersonal when you realize that Mr. Ney—what he has done to Ackley has, in effect, created a walking corpse."

[16]The pertinent part of the argument follows: "What an act of faith they are asking you to perform and accept a story like this. How

the facts. There is no testimony on that point. It is a figment of the imagination and I ask the Court to admonish the District Attorney.'' It is notable that he made no request that the court instruct the jury to disregard the remarks. The court stated that the remarks were ''Purely argument.'' Unquestionably the first part of the pertinent remarks is legitimate argument but it seems to us that in the italicized portion (see fn. 16, *ante*) the prosecutor was merely bringing before the jury his own unsworn testimony that a defendant asserting such a defense as in the instant case will repeat the same kind of crime. (*People* v. *Whitehead* (1957) 148 Cal. App.2d 701, 705-706 [307 P.2d 442].) As the court said in that case: ''It is always misconduct for a prosecutor to bring before a jury facts from his own experience which are not to be found in the evidence before them. 'Equally well-settled is the rule that statements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct.' (*People* v. *Kirkes,* 39 Cal.2d 719, 724 [249 P.2d 1]; *People* v. *Evans,* 39 Cal.2d 242, 251 [246 P.2d 636]; *People* v. *Cook,* 148 Cal. 334, 349 [83 P. 43]; *People* v. *Delgado,* 28 Cal.App.2d 665, 668 [83 P.2d 512].)'' (P. 706.)

As previously explained, most of the specifications of alleged misconduct have not been properly raised on this appeal since no adequate assignment of misconduct was made below, the acts in question not falling within either of the two exceptions to the general rule precluding appellate review. (*People* v. *Berryman, supra,* 6 Cal.2d 331, 337.) In two instances a proper and timely assignment was made: (a) in connection with the prosecutor's comment that defendant prevented his wife from testifying; and (b) in connection with the prosecutor's comment as to the type of defense relied upon by defendant. As to the first we have explained that the court's prompt and adequate action cured any harmful results. As to the second, after an examination of the entire cause, including the evidence, it does not appear to us to be reasonably probable that a result more favorable to defendant would have been reached in the absence of the above error. We cannot say there has been a miscarriage of justice.

---

can he dare get away from what he has done to Jack Ackley? How can he dare to? And this is not defense of insanity. The doctor himself testified there is no insanity in this defendant. *This is the type of defense if you accept and believe and acquit him, he will go right out and be a free man subject to fits of unconsciousness so that the occasion may arise when he can do it again.*'' (Italics added.) Defendant complains of the italicized portion.

(*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The attempted appeal from the order denying defendant's motion for a new trial is dismissed. The judgment is affirmed.

Molinari, J., and Sims, J., concurred.