[Crim. No. 27279. Second Dist., Div. Five. Jan. 27, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE JOINER, Defendant and Appellant.

## Counsel

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth and Richard D. Garske, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

KAUS, P. J.—Defendant Lawrence Joiner was charged in a two-count information with possession of marijuana for purposes of sale (Health & Saf. Code, § 11359), and assault with a deadly weapon upon a police officer (Pen. Code, § 245, subd.(b)). A jury found defendant guilty as charged on the marijuana count and guilty of a violation of section 245, subdivision (a), a lesser but necessarily included offense. He was sentenced to prison on count I; sentence on count II was stayed.[1]

### Facts

*Motion to Suppress Evidence*

In August 1974 a police officer staked out defendant's apartment and followed defendant, having apparently received information that defendant was involved in narcotics transactions. On August 27 the officer dialed a certain phone number from the police station and listened to a conversation between an informant and somebody on the other end of the line. The informant said, "I need some smoke," and the person at the other end said, "I only have a little bit, I'll get my supply in either Thursday or Friday."

Relying on section 1042 of the Evidence Code, the officer refused to identify the informant. This led to an *in camera* hearing under section 1042, subdivision (d), after which the trial court denied defendant's motion that the informant be identified.[2]

---

[1] The court fixed the minimum term at six months (Pen. Code, § 1202b) and requested diagnostic information (Pen. Code, § 1168).

[2] At defense counsel's request we augmented the record with the transcript of the *in camera* hearing. Counsel does not attack the constitutionality of the proceeding, but merely urges us "to determine whether or not the informant was a material witness and/or relevant to appellant's defense at trial." We have complied with counsel's request. It would subvert the purpose of section 1042, subdivision (d), if we said more than this: There is no conceivable way in which defendant was harmed by his inability to call the informant as a witness.

*Trial*

Defendant was arrested on September 9, 1974, at an apartment on Sommerset Drive. Three plain-clothes narcotic officers went to his apartment at about 9 p.m. One officer knocked on the door. He heard footsteps and what sounded like someone locking the door from the inside. The person inside, whose voice the officer identified as that of defendant, said, "Who is it?" The officer said, "It's Fish." Defendant asked, "Who do you want to talk to?" The officer answered that he wanted to "talk to Rocky." Defendant said, "He's not here right now. Do you want to leave a message?" During this conversation the officer smelled a strong odor of marijuana coming from inside the apartment. He told defendant that he was under arrest for possession of marijuana and that he was a police officer and had a search warrant. No one opened the door; the officer heard what sounded like footsteps running away from the door. He repeated: "Police officer. You are under arrest. Open the door." Believing that the person inside was either trying to arm himself or to destroy contraband, the officer kicked the door open and yelled again, "Police officer. You're under arrest."

As the officer entered the kitchen, he heard what sounded like a gunshot and felt something hit him in the face. This turned out to be a piece of plaster. The officer ducked down behind a kitchen cabinet and fired a shot in the direction from which he thought the person was shooting. He fired only one shot, and then yelled to the defendant in the bedroom, "We're police officers, . . . drop your gun and come out crawling on your belly." He repeated this command two or three times. Defendant then came crawling out and was arrested. There were no other persons in the apartment.

The odor of marijuana permeated the apartment, although none was burning. The smell was accounted for by the presence of a total of 3,829 grams of marijuana, with a "street value" of $1,530. It was distributed as follows: a shopping bag containing four wrapped bricks was in the kitchen oven; a small box containing marijuana was on a dresser in the bedroom; a brown bag containing marijuana was found in a kitchen cupboard above the refrigerator, and a single cigarette was on top of a television set in the bedroom. Also found was a .38 caliber revolver with five rounds—four live and one expended. A telephone bill and a gas bill made out to defendant was found. The apartment contained one double bed.

The defense was as follows: **Defendant had moved into that apartment** in July 1974, and shortly thereafter his brother, Landy, and a friend, Eugene Eppinger, had moved in too. Defendant paid the rent and utility bills. The weapon found in the apartment belonged to Eugene. On September 9, 1974, no one had announced himself as a police officer. Someone knocked on the door and asked whether Rocky was at home; defendant said Rocky was not at home and asked whether there was any message. The person outside said, "No" and walked away. Defendant returned to the bedroom. As he reached the bedroom he heard the front door crashing in; he was very scared; he did not know what was happening. He picked up Eugene's gun and fired a warning shot to scare the intruder.

At no time did defendant have any marijuana or contraband in his possession. He had never smelled or tried marijuana or any other drugs or narcotics. He had never seen Landy or Eugene smoke marijuana, and had never knowingly been to a party where marijuana was being smoked. He had no idea how the marijuana got in his apartment. While he was not accusing the officers of actually bringing the marijuana into the apartment, they were definitely lying as far as any marijuana being on top of the television set was concerned.

Defendant had a particularly difficult time explaining the marijuana in the kitchen oven. Although one of the officers had testified that he had actually seen a flame coming from the pilot in the oven, defendant maintained that the oven had never been connected and that during the two and one-half months he had been living in the apartment, he had never cooked anything.

Defendant attempted to explain his assaultive reaction to the officers' entry, by relating an earlier experience had had had at another apartment where he had lived with one Williams. Williams, too, had not paid him any rent. At one time Williams "had got in some trouble with some . . . guys, and they came and shot up" the apartment. Defendant, himself, was not present at the time and in no way involved in that incident.

On cross-examination of defendant, the prosecutor asked defendant a series of questions, copied below, suggesting that the reason that Eugene and Landy, as well as Williams, had been living with defendant rent free was that they were assisting him in selling narcotics and that the previous incident was somehow connected with defendant's narcotics business at

his old apartment.[3] Defendant answered each of the questions in the negative. His attorney did not object to any of them.

## DISCUSSION

■ Relying on *People* v. *Wagner,* 13 Cal.3d 612 [119 Cal.Rptr. 457, 532 P.2d 105], defendant argues that the prosecutor committed misconduct in asking him the questions quoted in footnote 3, *ante.* He also challenges the prosecutor's good faith, pointing out that at no time "did [he] make any attempt to substantiate any of these allegations"—meaning, no doubt, the allegations implied in the very asking of the questions.

*Wagner* differs from this case substantively and procedurally. While there, as here, the defendant charged with a narcotics offense, testified and answered a series of questions about prior narcotics activity in the negative, the main point of *Wagner* is that even affirmative answers would not have been admissible.[4] Reversal was mandated by prosecutorial misconduct: Although, in view of the defendant's denials of the

---

[3] Concerning the shooting incident at defendant's former apartment:

"Was your roommate at that time selling dope?"

"Were you selling dope at that apartment?"

"Mr. Joiner, isn't it a fact that you ripped somebody off and didn't give them dope and took their money, and that's why they were after you?"

"[Williams] never delivered narcotics for you?"

"And Tony Williams never delivered narcotics in return for free rent, either?"

Concerning defendant's activities at the Sommerset apartment:

"Isn't it a fact when the people came in the evening to Sommerset, you thought it was a dope dealer that you had ripped off that was trying to get you?"

"And [Eugene and Landy] never delivered any narcotics for you?"

"They didn't find buyer for your narcotics?"

Although the prosecutor used the words "dope" and "narcotics," he never suggested directly or indirectly that he was inquiring about anything except marijuana.

[4] *Wagner* held that the defendant, by testifying and by the tenor of his testimony, had placed his character in issue, both as a witness, as well as on the issue of guilt. (Evid. Code, § 1102.) Nevertheless, as far as impeaching the defendant as a witness was concerned, this could not be done by showing specific acts of misconduct that had not resulted in felony convictions. (Evid. Code, § 787.) Nor could the defendant, considered as his own character witness on the issue of guilt, be cross-examined with the traditional "have you heard" type of questions referring to specific acts. To permit such inquiry "would frustrate the policy underlying Evidence Code section 352 . . . ." The net result of *Wagner* is, therefore, that the evidence of the defendant's misconduct which the questions sought to elicit would have been inadmissible even if the prosecutor had obtained affirmative answers. Here, in contrast, no sensible argument can be made that in view of the nature of the defense put forward—defendant's claimed total unfamiliarity with marijuana and the mysterious incident at his former apartment—affirmative answers to the prosecutor's questions would not have been highly relevant on the issue of guilt and admissible in spite of the general principle stated in section 1101 of the Evidence Code.

implications of the prosecutor's questions no improper evidence was admitted, the prosecutor failed to show his good faith in asking them by "substantiating the charges" implied by the questions (*id.,* at p. 617) which "suggested to the jurors that [he] had a source of information unknown to them which corroborated the truth of the matters in question." (*Id.,* at p. 619.)

The procedural difference between this case and *Wagner* is that there "[d]efense counsel objected to most of these questions and further moved, unsuccessfully, for a dismissal and for a mistrial based upon the prosecutor's misconduct in asking these questions." (*Id.,* at p. 617.) Here, counsel did nothing. The point is therefore not before us unless the case is " ' "closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict," or "the act done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court." ' " (*People v. Chojnacky,* 8 Cal.3d 759, 765.)

This was obviously not a close case. Defendant was found very much at home in an apartment bursting with marijuana. His defense would have strained the credulity of the most gullible jury. Nor does the case come within the second exception noted in *Chojnacky.* It may be that after all eight questions were asked, nothing that the court could have done would have cured the harm, if any.[5] Clearly, however, this would not have been the case had counsel objected as soon as the first objectionable question was asked.

---

[5]Even if we were to reach the question of good faith, we doubt that the nature of the questions asked in this case, considered in light of the record, would call for any affirmative showing by the prosecution. In *People v. Perez,* 58 Cal.2d 229 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], one of the many improprieties committed by the prosecution was a question directed to a defense witness: "Mr. Hayward, you have been threatened, haven't you?" The Supreme Court observed that "[t]he prosecution made no attempt to prove that Hayward had been threatened by defendant, *nor was such threat suggested by any of the other evidence in the record.*" (*Id.,* p. 240. Italics added.) This passage is a recognition of the fact that questions logically suggested by the record with which the jury is familiar do not imply an extraneous source of information available to the prosecutor. Thus, where the prosecutor—as in *Wagner*—inquires about previous narcotics activities on specific dates which, as far as the record goes, he pulls out of thin air, it makes sense to infer that he knows something about what happened on that day. Where, however, the questions are general and based on legitimate inferences from the record, they carry no implication of a private source of information. Many cases in which questions were held improper, support this distinction. (*People v. Wagner,* 13 Cal.3d 612, 616 [119 Cal.Rptr. 457, 532 P.2d 105] [" 'Now, isn't it true that on December 30, 1971 you had in your possession approximately three kilograms of pure pharmacy cocaine . . . ?' "] *People v. Chojnacky, supra,* 8 Cal.3d 759, 765 [" 'Isn't it true before you were arrested . . . you told [the police] your name was something different? . . . Didn't you tell

■ Defendant further complains that the trial court erroneously refused to admit a July 3, 1974, traffic citation issued to Landy, as well as a September 10, 1974, booking form referring to him, each of which indicated that Landy had given defendant's apartment as his address.

Relying specifically on subdivision (c) of section 1280 of the Evidence Code, the trial court found that the proffered exhibit lacked trustworthiness as far as the source of the information—Landy—was concerned. The matter was within the trial court's discretion; we can find no abuse.[6]

The judgment is affirmed.

Stephens, J., and Ashby, J., concurred.

---

them your name was Jerry Gertz?' "]; *People* v. *Rocha,* 3 Cal.3d 893, 901 [92 Cal.Rptr. 172, 479 P.2d 372] [" 'Isn't it also a fact, . . . that you smoked a marijuana cigarette in back of the Capitol Bar—?' "]; *People* v. *Perez, supra,* 58 Cal.2d 229, 240; [" 'Mr. Hayward, you have been threatened, haven't you?' "]; *People* v. *Wong,* 35 Cal.App.3d 812, 833 [111 Cal.Rptr. 314] [" 'Do you remember telling Inspector Coreris that you were only waiting for dark to get rid of the body?' "]; *People* v. *Ney,* 238 Cal.App.2d 785, 795 [48 Cal.Rptr. 265] [" 'Didn't you throw the penis down the sewer?' "]; *People* v. *Miller,* 211 Cal.App.2d 569, 576 [27 Cal.Rptr. 290] [" 'Isn't it true this money you received in the form of checks from your father-in-law was money you had given him on a prior occasion in July of this year?' "]; *People* v. *Lo Cigno,* 193 Cal.App.2d 360, 371 [14 Cal.Rptr. 354] [" 'At any time that evening did you say the words "Now, Sam, now?" ' "].)

[6]There is some confusion in the record with respect to whether the traffic ticket, originally labeled "Exhibit F," was actually received in evidence relabeled as "Exhibit O." The record is not conclusive either way and we assume that the exhibit was not received. We note further, however, that the entire issue of whether defendant lived alone at the time of his arrest or shared his apartment with Eugene or Landy, or both, was essentially a red herring. It is simply inconceivable that they could have used defendant's apartment as a warehouse for their marijuana inventory without his being aware of their activities. The significance of their presence in the apartment might have been different had defendant admitted knowledge of the presence of marijuana and merely denied his own connection therewith.