[No. F015708. Fifth Dist. July 17, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
WARREN DeWAYNE PARKER et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

**COUNSEL**

Francia M. Welker and Catherine C. Czar, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Acting Assistant Attorney General, Roger E. Venturi and Edgar A. Kerry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BEST, P. J.**—Codefendants, Henry Odell Porter (Porter) and Warren De-Wayne Parker (Parker) were each convicted by jury of multiple Health and Safety Code violations: sale of cocaine base (Health & Saf. Code, § 11352); possession for sale of cocaine base (Health & Saf. Code, § 11351.5); and conspiracy to possess for sale or sell cocaine base (Pen. Code, § 182, subd. (a)). Porter was sentenced to state prison for the unstayed term of four years and four months. Parker received an unstayed term of eight years and four months. We will reject defendants' contentions of error in the admission of certain evidence. The People concede, and we agree, that Porter "correctly contends that because he was found guilty of both a greater and a necessarily included offense, the conviction as to the lesser included offense, count 5, must be reversed" and that Parker "correctly contends that because it is impermissible to be convicted on both the greater and the necessarily included lesser offense, his convictions on counts 3 and 5 must be reversed."

### STATEMENT OF FACTS

During October-November of 1990 Eddie King worked as a paid undercover narcotics informant for the Bakersfield Police Department. All three of the drug purchases involved in this case originated in the parking lot between the Rankin Hotel and the Super Burrito in downtown Bakersfield. In each transaction, King purchased the drugs in or at his El Dorado Cadillac.

*October 19, 1990*

About noon, King drove into the parking lot and Porter got into the passenger seat of King's Cadillac. King drove to Lakeview Avenue, where Porter got out of the car, walked over to a group of people and returned with Eric Nichols, from whom King had purchased drugs earlier that day. Nichols got into the car and King said he wanted another $20. Nichols gave King a small rock and King paid him $20. Nichols then left. King and Porter then went into a nearby liquor store, where King bought Porter a beer. King then drove off leaving Porter standing in the parking lot. Detective Greg Bender, who had been keeping King and Porter under surveillance in an unmarked car, then met with King. King gave Bender a small amount of rock cocaine.

*October 30, 1990*

About 4:30 p.m. King drove his Cadillac into the parking lot. Parker walked up to the driver's window, reached into his pants pocket, and put his

hand into the car. Detective Bailey thought he saw King hand Parker some currency. King then drove off and met with detectives to whom he gave a chunk of rock cocaine. King stated Parker had obtained the rock from his crotch, not his pocket. Officers stopped Parker, took his photograph and obtained his identity.

*November 1, 1990*

About 6:30 p.m. King pulled into the parking lot; Porter came up and asked King if he was "looking." When King said he was, Porter got into the Cadillac, said the man was upstairs and he (Porter) could get some. Porter left the car and went in the front door of the Rankin Hotel. He came out after a couple of minutes, got back into the Cadillac and gave King a rock of cocaine. King put the rock to his tongue, told Porter it tasted like salt and to get the seller. Porter took the rock, went back into the hotel and came right back with Parker. Parker told King the cocaine was good and King could pick another from the rocks he had in his pocket. King picked another rock and paid Parker $20. King gave Porter $5 and drove off. King then met with Detective Bailey and gave him a small chunk of cocaine.

*Identification of substances*

Jeanne Spencer, a criminalist, analyzed the substance admitted into evidence as being purchased on October 19, 1990, (People's exhibit 9) and testified the substance weighed .16 grams and contained base cocaine in a usable amount. Ms. Spencer did not personally analyze the substances admitted into evidence as being purchased by King on October 30 and November 1, 1990. She testified those substances were analyzed by another criminalist, Brenda Smith, with whom she worked in the Kern County Regional Laboratory and whose handwriting she recognized. Smith's laboratory reports (exhibits 10 and 11) were admitted into evidence over defendants' objections. Ms. Spencer was allowed to testify from those reports that the substances contained base cocaine.

## DISCUSSION

I. *Were Brenda Smith's laboratory reports admissible in evidence under the official records exception to the hearsay rule?*

The lab reports prepared by Brenda Smith were admitted in evidence by the trial court over the objections of defendants. Since these reports constituted the only evidence as to the identity of the substances purchased

by Eddie King on October 30 and November 1, 1990, defendants[1] contend their convictions on counts 2, 3, 4, and 5 must be reversed.

The prosecutor offered the lab reports relying upon Evidence Code[2] sections 1280 (record by public employee) and 1530 (copy of a writing in official custody).

Section 1280 provides:

"Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if:

"(a) The writing was made by and within the scope of duty of a public employee;

"(b) The writing was made at or near the time of the act, condition, or event; and

"(c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

Defendants objected to the lab reports on the grounds they constituted inadmissible hearsay and "We have no opportunity to cross-examine her [Brenda Smith] about her training and experience in the analysis of drugs or narcotics. And we don't know of what type of tests she performed, if any, on this, those two materials."

Defendants cite *People* v. *Flaxman* (1977) 74 Cal.App.3d Supp. 16, 20 [141 Cal.Rptr. 799], as follows: "[T]he inclusion of conclusions and opinions in a record does not render it inadmissible per se. . . . The overriding consideration is whether the record is trustworthy. . . ." (Fn. omitted.) Defendants further concede Jeanne Spencer's testimony satisfied the first two requirements of section 1280, the reports were made by and within the scope of duty of a public employee and at or near the time the analysis was done. They argue however the trustworthiness of the contents of the report, i.e., Brenda Smith's opinion the substances she analyzed contained base cocaine, was not established. Defendants point out, "There was no testimony as to Smith's qualifications as an expert in the field of cocaine analysis or as to the crime laboratory's hiring practices and requirements. There was no testimony as to what tests Smith conducted or the methodology she employed in analyzing the substance." They also note the reports themselves

---

[1]Parker joins in Porter's contention and argument on appeal.

[2]All further statutory references are to the Evidence Code unless otherwise indicated.

did not indicate what types of analyses were performed or the procedures used by Ms. Smith. Although Ms. Spencer testified she had checked the crime lab notes relating to the analyses made by Ms. Smith, Ms. Spencer was not permitted to testify that Ms. Smith followed the normal procedure in making her analyses.

The People respond, however, and we agree, that other testimony by Ms. Spencer established the procedures used by Ms. Smith in conducting her analyses as well as the trustworthiness of her conclusions. On direct examination, Ms. Spencer testified:

"Q. Are you familiar with the lab procedure for receiving evidence?

"A. Yes, I am.

"Q. Could you explain those procedures to the jury, please?

"A. In reference to drug evidence, a courier from a police agency, such as the Bakersfield Police Department or the Kern County Sheriff's Office, will bring drugs, drug evidence, over to us. We will basically stamp it in as received at the laboratory, it will get a lab number is the way we keep track of the evidence at the laboratory. It will then go into our laboratory vault until a criminalist has time to analyze that evidence." When asked to explain the procedure used in analyzing the evidence, Ms. Spencer testified:

"A. Okay. Basically I open up the package that the suspected drugs come in. I proceed to weigh the amount of substance there. I then go through a series of color tests. Then depending on what those indicate to me, I will go with two confirmatory tests, one is a microcrystalline test, the other is a process known as thin layer chromatography.

"Q. Are those tests standard in the industry?

"A. Yes, they are.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"Q. And what is done with the narcotics or the sample after you complete your analysis?

"A. I basically repackage the sample, place it back into the envelope, seal the envelope, place it into our vault and then at a later date a courier, in this case Bakersfield Police Department, will come by and pick up the evidence.

"Q. The procedures you have outlined to the jury, are those the procedures followed by all the people in the Crime Lab?

"A. Yes, they are."

On cross-examination Ms. Spencer testified in detail as to the tests performed by her in making her analysis of the substance contained in exhibit 9 and then as follows regarding the analyses by Brenda Smith:

"Q. Ms. Spencer, you indicated or testified earlier that on what's been marked as People's Exhibit 10 and 11 that have been conducted a normal analysis, I believe was the term you used. Is that correct?

"A. Yes.

"Q. Looking at those documents, what is it that leads you to believe it was quote a normal analysis?

"A. Was basically the way it was written. And also, of course, I did look at her notes prior to coming to Court so I do have her notes to indicate.

"Q. I'm sorry, I didn't mean to cut you off.

"A. Basically her notes indicated that nothing out of the ordinary occurred.

"Q. Okay. Then the notes that you reviewed then indicated what kind of procedures she went through. Is that correct?

"A. That's correct."

We conclude the trial court's ruling admitting Brenda Smith's reports was proper. Under section 1280 a record may be admitted into evidence if it was made by and within the scope of duty of a public employee at or near the time of the act, condition, or event recorded and if the sources of information and the method and time of preparation were such as to indicate its trustworthiness. (*People* v. *Wardlow* (1981) 118 Cal.App.3d 375, 388 [173 Cal.Rptr. 500]; *People* v. *York* (1980) 108 Cal.App.3d 779, 790-791 [166 Cal.Rptr. 717].) ■ "The trustworthiness requirement for this exception to the hearsay rule is established by a showing that the written report is based upon the observations of public employees who have a *duty* to observe the facts and report and record them correctly." (*People* v. *Baeske* (1976) 58 Cal.App.3d 775, 780 [130 Cal.Rptr. 35].) Whether the trustworthiness requirement has been met is a matter within the trial court's discretion. (*People* v. *Joiner* (1976) 54 Cal.App.3d 910, 917 [127 Cal.Rptr. 166].)

The Comment of the Law Revision Commission to section 1280 notes:

"The evidence that is admissible under this section is also admissible under Section 1271, the business records exception. However, Section 1271 requires a witness to testify as to the identity of the record and its mode of preparation in every instance. In contrast, Section 1280, as does existing law, permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity and mode of preparation if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness."

 The trial court was obviously satisfied as to the trustworthiness of the laboratory reports prepared by Brenda Smith, a criminalist employed by the Kern County Regional Laboratory, based on the testimony of Jeanne Spencer identifying the reports and detailing the tests and procedures used by all criminalists employed by the laboratory, that said procedures were standard in the industry, and that Ms. Smith's notes indicated she had followed the normal procedures. The court's implied finding of trustworthiness is amply supported by sufficient evidence independent of the reports themselves. The trial court did not abuse its discretion by admitting the reports.

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The conviction of Henry Odell Porter for possession for sale of cocaine base (count 5) is vacated.

The convictions of Warren DeWayne Parker for possession for sale of cocaine base (count 3 and count 5) are vacated.

The judgments are affirmed in all other respects.

The superior court is directed to prepare amended abstracts of judgment and to forward certified copies to the appropriate authorities.

Ardaiz, J., and Thaxter, J., concurred.

A petition for a rehearing was denied August 3, 1992, and appellants' petition for review by the Supreme Court was denied October 16, 1992.

---

*See footnote, *ante*, page 110.